United States District Court
Southern District of Texas
**ENTERED**
October 15, 2019
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| HECTOR SIGIFREDO RIVERA ROSA, *et al.*, | § § § | |
| Petitioners, | § | |
| VS. | § § § | CIVIL ACTION NO. 1:19-CV-00138 (Lead) |
| KEVIN K. MCALEENAN, *et al.*, | § § § | |
| Respondents. | § | |

———————————————————————————————

| | | |
|---|---|---|
| JAIRO ALEXANDER GONZALEZ-RECINOS, *et al.*, | § § § | |
| Petitioners, | § | |
| VS. | § § § | CIVIL ACTION NO. 1:19-CV-00095 (Member) |
| KEVIN K. MCALEENAN, *et al.*, | § § | |
| Respondents. | | |

———————————————————————————————

| | | |
|---|---|---|
| JAVIER ERNESTO GIRON MONTERROZA, *et al.*, | § § § | |
| Petitioners, | § | |
| VS. | § § § | CIVIL ACTION NO. 1:19-CV-00103 (Member) |
| KEVIN K. MCALEENAN, *et al.*, | § § | |
| Respondents. | | |

———————————————————————————————

| | | |
|---|---|---|
| SANTOS ZUNIGA, *et al.*, | § § | |
| Petitioners, | § | |
| VS. | § § § | CIVIL ACTION NO. 1:19-CV-00118 (Member) |
| KEVIN K. MCALEENAN, *et al.*, | § § | |
| Respondents. | | |

———————————————————————————————

BRYAN LOPEZ-LOPEZ, *et al.*,           §
                                        §
        Petitioners,                    §
VS.                                     §    CIVIL ACTION NO. 1:19-CV-00126
                                        §                (Member)
                                        §
KEVIN K. MCALEENAN, *et al.*,           §
                                        §
        Respondents.

## <u>ORDER</u>

United States Customs and Border Protection (CBP) detained sixteen aliens for being in the United States illegally and kept them in its custody for weeks before transferring them to the custody of Immigration and Customs Enforcement (ICE). CBP allegedly maintained these aliens in abhorrent conditions and without access to, or contact with, counsel or family. The detained aliens filed five lawsuits, which have now been consolidated into this action, alleging a petition for writ of habeas corpus and causes of action based on alleged violations of the Administrative Procedure Act and the Fifth Amendment of the United States Constitution.[1] Petitioners advance their claims in their individual capacities and as putative class representatives of similarly situated aliens in CBP custody.[2]

Petitioners currently seek a preliminary injunction that would require Respondents to, among other things, grant detained aliens access to counsel while in CBP custody, improve the conditions at CBP facilities, and transfer all aliens from CBP custody to ICE custody within seventy-two hours, or otherwise release the aliens on bond or with electronic monitoring.

In each of the individual lawsuits, the Court denied the request for a temporary restraining order and scheduled a preliminary injunction hearing. Following consolidation,

---

[1] Respondents include Kevin K. McAleenan, Acting Secretary of the United States Department of Homeland Security and Commissioner of United States Customs and Border Protection, John P. Sanders, Acting Commissioner of United States Customs and Border Protection, Carla Provost, Chief of the United States Border Patrol, Rodolfo Kasich, Chief Patrol Agent—Rio Grande Valley Sector, and Michael J. Pitts, Field Office Director of the Port Isabel Service Processing Center for Immigration and Customs Enforcement. Petitioners sue these individuals in their official capacity. The Court takes judicial notice that McAleenan no longer serves as Acting Secretary of DHS.

[2] The certification of a proposed class is not currently before the Court.

Petitioners filed their Second Amended Petition,[3] and then filed their Motion for Preliminary Injunction.[4] On September 5 and 6, 2019, the Court held a two-day evidentiary hearing during which 11 witnesses testified.[5] The record contains numerous exhibits and several briefs, including one from amici American Civil Liberties Union Foundation of Texas and the American Civil Liberties Union Foundation.[6]

The Court has considered the substantial record and the applicable law. For the following reasons, the Court finds that the Motion for Preliminary Injunction should be denied.

## I. Findings of Fact

Based on the exhibits in the record and the testimony the parties presented at the preliminary injunction hearing, the Court makes the following findings of fact.[7]

### A. Standard Procedures for Detained Aliens[8]

United States Customs and Border Protection (CBP), a component of the Department of Homeland Security (DHS), safeguards the nation's borders. The United States Border Patrol serves as CBP's law enforcement office. By law, Border Patrol's primary responsibilities include "interdicting persons attempting to illegally enter or exit the United States".[9] CBP detains individuals who cross "the border illegally[], process[es] them and then turn[s] them over to

---

[3] Doc. 29. The Court will cite to filed documents by their CM/ECF number—e.g., "Doc. ___".
[4] Doc. 41.
[5] Docs. 89 and 93. The Court will reference the testimony from September 5 as "Inj. Hrg., Doc. 89, page#:line#", and the testimony from September 6 as "Inj. Hrg., Doc. 93, page#:line#".
[6] Docs. 41, 42, 69, 87 and 89-101.
[7] Respondents object to some of Petitioners' filed exhibits. (Respondents' Corrected Objections to Plaintiffs' Proposed Exhibits, Doc. 77) The Fifth Circuit has established that "a preliminary injunction proceeding is not subject to jury trial procedures" and that District Courts may rely on affidavits and other hearsay evidence to consider the requested relief. *Fed. Savings and Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987); *see also Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993) ("[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence."). While Petitioners submit several exhibits that constitute hearsay and that are of limited relevance, the Court concludes that for most of these documents, the issue is one that goes to the weight of the evidence. Accordingly, the Court SUSTAINS the objections to Petitioners' proposed exhibits 20 and 23, which are newspaper articles, and OVERRULES the remaining objections.
[8] This section describes the standard procedures for detained aliens. The Petitioners allege that Respondents do not always comply with these standards.
[9] 6 U.S.C. § 211(e)(3)(B).

Immigration and Customs Enforcement [ICE]".[10]  (In this Order, the term CBP includes the actions of Border Patrol.)

When CBP detains an alien in the field, an initial medical field screening occurs.[11]  If an alien requires immediate medical attention, CBP takes the alien to the closest medical facility.[12] Otherwise, CBP transports the individual to a CBP station.  This lawsuit concerns CBP stations in the Texas counties of Cameron, Willacy, Starr, and Hidalgo.  As of April 2019, within those counties, CBP maintained a Centralized Processing Center in McAllen and stations in Rio Grande City, McAllen, Weslaco, Harlingen, Fort Brown, and Brownsville (collectively, the "CBP Stations").[13]  Until the Spring of 2019, CBP transported most aliens to the McAllen Centralized Processing Center, which has a maximum capacity of 1,500 aliens.[14]

When aliens arrive at a CBP Station, they receive another medical examination.  If medical personnel determine that an alien requires care, or if the alien expresses medical needs, CBP transports the alien to a medical center or has medical personnel at the station address the issue.[15]

For aliens who clear the medical examination, CBP conducts an initial interview, known as vetting or intake.[16]  As part of this vetting, an immigration officer interviews the alien to obtain background information, biometrics, and criminal history.[17]  This process enables CBP to confirm the identity of the alien.[18]  The immigration officer will inform the alien of the right to have his country's consular office notified of his arrest or detention, and this notification is documented in a Consular Notification Form, which each alien signs.[19]  For detainees from

---

[10] Inj. Hrg., Doc. 93, 8:4–7.
[11] *Id.* at 148:23–149:2.
[12] *Id.* at 26:13–22, 52:14–22 and 97:24–25.
[13] *Id.* at 7:1–15, 89:18–25 and 156:2–3.  The Rio Grande Valley Border Patrol Sector also includes stations in Corpus Christi, Falfurrias, and Kingsville, but those cities are not in the counties at issue in this lawsuit.
[14] *Id.* at 18:10–15, 83:16–84:1 and 153:11–21.
[15] *Id.* at 24:5–24 and 97:24–98:9.
[16] Qualia Decl., Doc. 48-1, ¶ 10; Inj. Hrg., Doc. 93, 84:14–25 and 92:5–11.
[17] Qualia Decl., Doc. 48-1, ¶ 11.
[18] *Id.* at ¶ 10.
[19] *Id.*; Consular Not. Form, Doc. 48-1, 11 (explaining that the consular officer "may be able to help you obtain legal representation, and may contact your family and visit you in detention, among other things").  CBP uses this form to

Spanish-speaking countries, CBP uses a Spanish language version of the form and provides a translator. The immigration officer will then designate the alien for expedited removal or for removal proceedings.

## 1. Expedited Removal

Expedited removal applies when an alien found inadmissible by an immigration officer is encountered within 100 miles of the border and cannot show he was physically present in the United States continuously for the 14 days before being encountered.[20] Under expedited removal, an immigration officer may "order the alien removed from the United States without further hearing or review."[21] Before removal, however, the immigration officer poses various questions to the alien, including the four in Form I-867B:

Why did you leave your home country or country of last residence?

Do you have any fear or concern about being returned to your home country or being removed from the United States?

Would you be harmed if you are returned to your home country or country of last residence?

Do you have any questions or is there anything else you would like to add?[22]

The immigration officer records the responses on the form, and requests that the alien sign it under oath, confirming that the answers are true and correct.[23]

If an alien does not express fear of being returned to his country, Department of Homeland Security regulations require that the alien be advised of the charges against him and the details on his "identity, alienage, and inadmissibility," and that he be provided "an opportunity to respond" to the charges.[24] Having done so, if the alien is from Mexico, CBP can

---

satisfy the requirement of 8 C.F.R. § 236.1(e), which requires that every alien be notified of his or her right to "communicate with the consular or diplomatic officers of the country of his or her nationality in the United States".)

[20] *See* 8 U.S.C. § 1225(b)(l)(A)(iii); 69 Fed. Reg. 48877, 48880 (Aug. 11, 2004).

[21] 8 U.S.C. § 1225(b)(1)(A)(i)–(iii); *see also Brumme*, 275 F.3d at 447.

[22] Form I-867B, Doc. 48-1, 12; Qualia Decl., Doc. 48-1, ¶ 11.

[23] Form I-867B, Doc. 48-1, 12.

[24] *See* 8 C.F.R. § 235.3(b)(2)(i); *see also* DHS Standard Forms, Docs. 91-1 and 92-1.

deport the alien without further proceedings.[25]  If the alien is from a non-contiguous country, CBP transfers the alien to ICE, which then deports the individual.[26]

But if an alien under expedited removal proceedings conveys an intent to apply for asylum or expresses a fear of persecution in his home country, all removal proceedings must stop "until the alien has been referred" for a credible fear interview before an asylum officer.[27] CBP makes no determinations on the merits of a credible fear interview, and does not conduct such interviews.[28]  Most aliens who require a credible fear interview await transfer to ICE custody and are then interviewed at an ICE facility.  Once CBP transfers an alien to ICE custody, CBP's responsibility as to the care and custody of that alien ends.[29]

An alien who requires a credible fear interview receives a Form M-444, "Information About Credible Fear Interview", which describes the interview process and the alien's rights.[30] The alien has the "right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government" and "the right to request that an immigration judge review the asylum officer's credible fear determination".[31]  Form M-444 also notifies the alien of the "consequences if the asylum officer determines the absence of a credible fear of persecution or torture".[32]

CBP does have the authority, with approval from its headquarters, to release individuals from CBP custody with a Notice to Appear.[33]  However, this release mechanism does not typically apply to those under expedited removal proceedings.[34]

---

[25] Inj. Hrg., Doc. 93, 87:1–9.
[26] *Id.*
[27] *See* 8 U.S.C. § 1225(b)(1)(A)(i)–(ii), (b)(1)(B)(i); *see also Maldonado v. Macias*, 150 F. Supp. 3d 788, 797 (W.D. Tex. 2015); 8 C.F.R. § 208.30; 8 C.F.R. § 235.3.
[28] Qualia Decl., Doc. 48-1, ¶ 11.
[29] Inj. Hrg., Doc. 93, 8:4–7 and 74:1–5.
[30] Qualia Decl., Doc. 48-1, ¶ 11.
[31] 8 C.F.R. § 235.3(b)(4)(i).
[32] *Id.*
[33] Inj. Hrg., Doc. 93, 59:5–13 and 72:23–73:3.
[34] *Id.* at 73:23–74:9.

### 2. Removal Proceedings

Based on the initial interview with an alien, an immigration officer can conclude that the alien is inadmissible or subject to deportation under applicable statutes based on several grounds, including health concerns, criminal history, security risks or marriage fraud.[35]  In such cases, the immigration officer processes the alien for removal proceedings under 8 U.S.C. § 1229.  CBP usually transfers an alien designated for removal proceedings to ICE custody.[36]  Upon transfer, CBP's responsibility as to the care and custody of that alien ends.

With some exceptions, Section 1226 of Title 8 governs the detainment of aliens processed for removal proceedings.  The Attorney General can detain the alien or release him on bond or conditional parole "pending a decision on whether the alien is to be removed from the United States," except as provided in § 1226(c), which requires the "detention of criminal aliens".[37]  An alien may appeal his custody terms to an Immigration Judge, who also oversees the removal proceeding process.[38]

### B. Procedures and Standards for Conditions at CBP Stations

When CBP transports aliens to a station, CBP places them in hold rooms based on several factors, such as age, gender, and whether the aliens are traveling as a family unit.  CBP moves aliens among different hold rooms depending on their stage in processing, for meals, for the cleaning of hold rooms, and for security concerns.  The size and capacity of hold rooms vary, but every hold room has multiple concrete benches, a toilet, a sink, and access to drinking water.[39]

In October 2015, CBP promulgated its National Standard of Transport, Escort, Detention, and Search ("TEDS Standards") to "govern CBP's interaction with detained

---

[35] *See* 8 U.S.C. § 1182(a); 8 U.S.C. § 1227(a).
[36] Inj. Hrg., Doc. 93, 8:4–7.
[37] 8 U.S.C. § 1229(a)(2).
[38] 8 C.F.R. § 1003.19(c); 8 C.F.R. § 1236.1(d)(1).
[39] Qualia Decl., Doc. 48-1, ¶¶ 14-15; Photos of Fort Brown Station, Doc. 98-1.

individuals."[40]   Under the TEDS Standards, "[t]he safety of CBP employees, detainees, and the public is paramount during all aspects of CBP operations."[41]   CBP must make every effort "to promptly transfer, transport, process, release, or repatriate detainees as appropriate according to each operational office's policies and procedures, and as operationally feasible."[42]   "Detainees should generally not be held for longer than 72 hours in CBP hold rooms or holding facilities."[43]   Respondents agree that CBP designed and maintains its stations for the short-term detention of aliens.[44]

"Every effort must be made to ensure that hold rooms house no more detainees than prescribed by the operational office's policies and procedures . . . and [c]apacity may only be exceeded with supervisory approval."[45]   Even so, "under no circumstances should the maximum occupancy rate, as set by the fire marshal, be exceeded."[46]

The TEDS Standards provide guidance on many factors related to the conditions under which CBP detains aliens, including:

Medical Care: "[U]pon a detainee's entry into any CBP hold room, . . . observed or reported injuries or illnesses should be communicated to a supervisor . . . and appropriate medical care should be provided or sought in a timely manner . . . .  "[I]f officers/agents suspect that a detainee has an observed or reported medical condition, such as a contagious disease, appropriate protective precautions must be taken."[47]

Temperature: "When it is within CBP control, officers/agents should maintain hold room temperature within a reasonable and comfortable range for both detainees and officers/agents.  Under no circumstances will officers/agents use temperature controls in a punitive manner."[48]

Hygiene: "Detainees must be provided with basic personal hygiene items, consistent with short term detention and safety and security

---

[40] TEDS Standards, Doc. 87-21.
[41] *Id.* at § 1.1.
[42] *Id.* at § 1.8; *see also id.* at § 4.1 ("Every effort must be made to hold detainees for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible.").
[43] *Id.* at § 4.1.
[44] Inj. Hrg., Doc. 93, 17:11–17; *see also* OIG Report, Doc. 87-12, 3.
[45] TEDS Standards, Doc. 87-21, § 4.7.
[46] *Id.*
[47] *Id.* at § 4.3.
[48] *Id.* at § 4.7.

needs.  Reasonable efforts will be made to provide showers, soap, and a clean towel to detainees who are approaching 72 hours in detention."[49]

Food:       "Food provided must be in edible condition (not frozen, expired, or spoiled).  Adult detainees, whether in a hold room or not, will be provided with food at regularly scheduled meal times.  Adult detainees, whether in a hold room or not, will be provided with snacks between regularly scheduled meal times."[50]

Water:      "Functioning drinking fountains or clean drinking water along with clean drinking cups must always be available to detainees."[51]

Cleanliness:      "All facilities or hold rooms used to hold detainees must be regularly and professionally cleaned and sanitized."[52]

### C.  Number of Detentions and Average Time in CBP custody

#### 1.  2019 Surge

In recent years, the Rio Grande Valley has consistently represented between 40–45% of the total apprehensions along the United States' southern border with Mexico:[53]

| Fiscal Year | Southern Border Total Apprehensions | RGV Apprehensions | Percentage of Apprehensions Represented by RGV |
|---|---|---|---|
| Oct. 2015 – Sept. 2016 | 408,870 | 186,830 | 46% |
| Oct. 2016 – Sept. 2017 | 303,916 | 137,562 | 45% |
| Oct. 2017 – Sept. 2018 | 396,579 | 162,262 | 41% |

During these three fiscal years, the average monthly apprehensions have totaled 15,569, 11,464 and 13,522, respectively.

Beginning in the first quarter of 2019, CBP experienced a sharp increase in the number of detained aliens.  The increased volume began in January, peaked in May, and remained high through July:[54]

---

[49] *Id.* at § 4.11.
[50] *Id.* at § 4.13.
[51] *Id.* at § 4.14.
[52] *Id.* at § 4.7.
[53] Border Patrol Data by Month, Doc. 87-1; Inj. Hrg., Doc. 93, 8:17–24.
[54] RGV FY Apprehensions, Doc. 89-2; Inj. Hrg., Doc. 93, 10:5–10.

| | |
|---|---|
| January | 17,711 |
| February | 25,355 |
| March | 33,758 |
| April | 36,699 |
| May | 49,761 |
| June | 43,170 |
| July | 36,860 |

During these seven months, the monthly average equaled 34,793. At the height of the 2019 Surge, in May, CBP detained 2,400 aliens in one twenty-four-hour period.[55] As of early September 2019, Border Patrol had apprehended 328,000 individuals for Fiscal Year 2019—"a hundred percent increase" over Fiscal Year 2018.[56]

The demographics of the detained aliens also changed during the 2019 Surge. Notably, about 50% of men crossing the border arrived accompanied by children, which represented a much higher percentage than historical norms.[57] In 2014, for example, 1% of male aliens came with children.[58] Overall, family units—which consist of a parent or guardian accompanied by a child—represented about 60% of all apprehensions for Fiscal Year 2019.[59]

CBP has also experienced a 126% increase over Fiscal Year 2018 in apprehensions of "OTM" aliens—i.e., aliens Other Than Mexican.[60] In general, repatriation to a contiguous country, such as Mexico, occurs more expeditiously, as CBP can remove a Mexican alien directly and without involving other agencies.[61] In contrast, for OTM aliens, the removal process must run through ICE, and the requisite transfer of the alien to ICE custody increases the time and resources required for removal.[62]

As the number of individuals and complexity of cases increased, so did processing time in CBP Stations.[63] At the high point of the 2019 Surge, the "median time in custody for single

---

[55] Inj. Hrg., Doc. 93, 11:1–6.
[56] *Id.* at 10:19–23.
[57] *Id.* at 79:17–24.
[58] *Id.* at 79:13–16.
[59] *Id.* at 12:23–25.
[60] RGV Apprehensions, Doc. 89-3.
[61] Inj. Hrg., Doc. 93, 14:8–11 and 87:2–9.
[62] *Id.*
[63] *Id.* at 91:19–92:4.

adults in the RGV sector was 428 hours", or about 18 days.[64]  The increased time that detained aliens remained in CBP custody stemmed not only from the increased volume of detainees, but also from CBP's decision to prioritize processing, transferring or releasing unaccompanied children and family units.[65]  CBP made this decision in part to comply with the *Flores* Settlement Agreement related to unaccompanied children.[66]  As a result, single adults received lower priority for processing and thus experienced longer detention periods.[67]

### 2.  Third Quarter 2019

In recent months, CBP has experienced a decrease in detentions.  July remained high, at 36,860 individuals detained, but by August that number decreased to about 11,000.[68]  As a result, by the time of the preliminary injunction hearing in early September, the average time in CBP custody had decreased to 60.89 hours for all individuals, 36.83 hours for OTM single adults and 35.29 hours for Mexican single adults.[69]

CBP attributed the decreased detention figures to several factors.  First, the United States in January 2019 implemented the Migrant Protection Protocols (MPP), under which some individuals who arrive by crossing the Mexican border can be required to await in Mexico for their hearing in the United States.[70]  This release of aliens naturally lessens the number of detainees in CBP stations.[71]

Second, CBP credits the efforts of Central American countries to stem the flow of migrants.[72]  For example, in the past, some Central American countries required individuals

---

[64] Qualia Decl., Doc. 48-1, ¶ 39.
[65] Inj. Hrg., Doc. 93, 16:13–17.
[66] *Id.* at 16:25–17:8.
[67] *Id.* at 16:6–24.
[68] RGV FY Apprehensions, Doc. 89-2; RGV Sector FY18 & FY19TD Removable Apprehensions: by Demographic, Doc. 89-4.
[69] RGV Sector Deportable Detainees in Custody, Doc. 99-1, 1–2.
[70] Policy Guidance for Implementation of the Migrant Protection Protocols, Doc. 89-6; Implementation of the Migrant Protection Protocols, Doc. 89-7; Inj. Hrg., Doc. 93, 37:20–38:2.  The MPP has been the subject of litigation and its implementation at times has been enjoined.  *See Innovation Law Lab, et al. v. Nielsen, et al.*, 366 F. Supp. 3d 1110 (N.D. Ca. 2019)(enjoining enforcement of the MPP); *see also Innovation Law Lab, et al. v. Nielsen*, et al., 924 F.3d 503 (9th Cir. 2019)(staying injunction of the MPP pending consideration of the appeal).  Earlier this month, the Ninth Circuit heard oral argument for the appeal.  (Petitioners' Advisory to the Court, Doc. 112, 2–3)
[71] Inj. Hrg., Doc. 93, 68:3–9.
[72] *Id.* at 40:7–12 and 69:7–16.

subject to repatriation to obtain travel documents before the repatriation occurred. Currently, however, the Guatemalan Cooperative Agreement between that country and the United States authorizes the repatriation of Guatemalans before the issuance of travel documents.[73] This agreement lessens the time that these aliens spend in custody in the United States.

### D. Conditions in CBP Facilities during the 2019 Surge

Both Petitioners and Respondents agree that during the 2019 Surge, the conditions at CBP Stations deteriorated and reached levels that did not comply with the TEDS Standards.[74] The evidentiary record reveals not only deplorable conditions, but also that detained aliens remained in those conditions for extended periods of time.

In July 2019, the Acting Inspector General provided the Acting Secretary of the Department of Homeland Security with a Management Alert entitled, "Dangerous Overcrowding and Prolonged Detention of Children and Adults in the Rio Grande Valley".[75] The Office of Inspector General (OIG) issued the report after visiting five CBP facilities in the Rio Grande Valley, including several at issue in this lawsuit. The OIG Report contains images depicting the extreme overcrowding of families and adults, and highlights many deficiencies in the conditions at the stations visited, including:

> One facility had held single adults in standing-room-only conditions for a week;
>
> During OIG visits, detainees "banged on the cell windows, shouted, pressed notes to the window with their time in custody, and gestured to evidence of their time in custody";
>
> Most single adults had not had a shower despite several being held for as long as a month;
>
> "Most single adult detainees were wearing the clothes they arrived in days, weeks, and even up to a month prior."[76]

---

[73] *Id.* at 40:1–12.
[74] At the Preliminary Injunction hearing, CBP witnesses agreed "absolutely" that CBP was not prepared for the 2019 Surge, that CPB had been caught "flatfooted", and that CBP did not always comply with the TEDS Standards during this period. *Id.* at 22:20–21, 44:8–9 and 46:7–12.
[75] OIG Report, Doc. 87-12.
[76] *Id.* at 4–9. Although this lawsuit does not involve the treatment afforded minors in CBP custody, the OIG Report also reported that children had limited access to a change of clothes and, at two facilities, children had not been provided hot meals until the week of the OIG visits. *Id.*

The OIG Report concluded that under the overcrowded conditions, "CBP was not able to meet TEDS standards."[77]

The OIG Report also noted that "3,400 detainees had been held longer than the 72 hours generally permitted under the TEDS standards."[78]  "Of those 3,400 detainees, CBP held 1,500 for more than 10 days."[79]  The report stressed that "overcrowding and prolonged detention represent an immediate risk to the health and safety of DHS agents and officers, and to those detained."[80]

During the preliminary injunction hearing, no CBP witness disagreed with the findings of the OIG Report.[81]  They did highlight that the report had failed to recognize the factors that led to the overcrowded conditions and the efforts that CBP had initiated in response to the situation, but ultimately, the witnesses agreed that the conditions were substandard.[82]

The testimony that several Petitioners provided during the hearing echoed the findings in the OIG Report.  Each of the Petitioners spent time in the CBP Stations during the 2019 Surge.[83]  Their testimony and other portions of the record confirmed that all CBP Stations were overcrowded.[84]  Because CBP designed the facilities for short-term detention, CBP did not incorporate basic necessities that long-term facilities typically provide.  These circumstances affected many aspects of the conditions in which CBP maintained aliens, at times for prolonged periods.  Testimony also revealed that CBP often exceeded the maximum capacity of the holding cells.[85]

The overcrowded conditions worsened the detained aliens' sleeping arrangements.  The holding cells contained too many individuals to enable all of them to lie down, so the aliens slept

---

[77] *Id.* at 8.
[78] *Id.* at 3.
[79] *Id.*
[80] *Id.* at 7.
[81] Inj. Hrg., Doc. 93, 58:3–6, 94:2–10 and 163:24–164:3.
[82] *Id.* at 27:1–28:5, 94:2–15 and 163:24–164:24.
[83] Some Petitioners also spent time in CBP stations not at issue in this lawsuit, such as the station in Corpus Christi. While the witnesses did not always limit their testimony to the relevant facilities, they generally provided similar and consistent testimony for all the CBP stations.
[84] Inj. Hrg., Doc. 86, 85:7–22, 90:17–25, 118:15–25, 142:19–25 and 143:11–14.
[85] *Id.* at 85:7–15, 90:17–22, 118:17–25, 155:6–14 and 185:23–186:10.

standing up or took turns sleeping on the ground.[86]  CBP lacked sufficient sleeping mats, requiring detainees to sleep on the concrete floor.[87]  The lights remained on throughout the night, for security reasons and because CBP activities continued around the clock, including moving aliens between the holding cells.[88]

Most CBP Stations lack showers.  One witness testified that he did not shower for 52 days, and another testified that he showered once in 52 days.[89]  At best, some CBP Stations occasionally offered the detained aliens wet wipes, although the wipes often proved inadequate.[90]  CBP also only occasionally provided basic hygienic products, such as toothbrushes and toothpaste.[91]  Consistent with this testimony, one Petitioner testified that he spent 50 days without a toothbrush.[92]

The holding cells contain only one toilet with limited privacy, especially in an overcrowded room.[93]  As the toilet is inside the holding cell and not within a separate enclosed area, the smell of urine and feces permeated the room.[94]  At times, the heavy use of the toilet led to its overflowing.[95]  One witness testified that during his stay in a holding cell, the toilet overflowed and was not repaired immediately, requiring some detained aliens to sleep or stand in the waste overnight.  Those detainees were not provided a shower or clean clothes after standing in the filth.[96]

Several aliens testified about the inadequate food provided to them.  Most received food three times per day, but during certain periods, the three meals consisted of a cookie for breakfast, and a bologna sandwich for lunch and for dinner.[97]  Some received even less food.[98]

---

[86] *Id.* at 65:3–11, 123:11–20, 183:2–11 and 203:15–21; Inj. Hrg., Doc. 93, 22:6–7.
[87] Inj. Hrg., Doc. 86, 65:3–11, 123:11–20, 183:2–11 and 203:15–21; Inj. Hrg., Doc. 93, 22:6–7.
[88] Inj. Hrg., Doc. 86, 100:10–14, 186:11–13 and 205:15–18; Inj. Hrg., Doc. 93, 162:16–25.
[89] Inj. Hrg., Doc. 86, 152:17–19 and 182:5.
[90] *Id.* at 106:7–9, 159:10–160:9 and 192:5–8.
[91] *Id.* at 100:4–9, 183:2–11, 192:5–20 and 197:3–4; Inj. Hrg., Doc. 93, 23:4–10.
[92] *Id.* at 192:8-12.
[93] *Id.* at 66:15–18, 86:7–9, 98:22–99:6 and 182:5–8; Inj. Hrg., Doc. 93, 22:8–13.
[94] Inj. Hrg., Doc. 86, 205:4–6.
[95] *Id.* at 91:25–92:20, 96:1–25, 119:8–120:16 and 205:19–207:19.
[96] *Id.*
[97] Inj. Hrg., Doc. 86, 87:6–89:3, 92:21–94:14 and 119:1–7; *see also* OIG Report, Doc. 87-12, 9 ("Many single adults had been receiving only bologna sandwiches.").

Only on rare occasions would detainees receive a hot meal or fruit.[99]  This diet unsurprisingly caused some aliens to "becom[e] constipated and requir[e] medical attention."[100]

CBP provided medical care, including dental services, although some detained aliens testified that they received inadequate medical attention.[101]  Due to the close quarters, sicknesses spread among the detainees.[102]  And detained aliens at times shared medicine.[103]

Detained aliens consistently referred to the CBP Stations as "hieleras" (the Spanish word for icebox) because of the low temperatures in the holding rooms.[104]  The Petitioners who testified noted the cold environment in CBP Stations,[105] although CBP witnesses testified that they kept the thermostat set at 74 degrees in McAllen, with the temperature at Donna III varying from 66 to 80 degrees.[106]  CBP provided mylar blankets, but several detained aliens testified that the blankets emitted a fine dust, which led to respiratory problems for themselves and other aliens.[107]

Detained aliens had almost no communication with family or attorneys during their detention.  CBP acknowledged that its stations are not designed to allow attorneys to visit with detained aliens, in part because allowing such visits could create security risks for the attorneys.[108]  This CBP policy confirms the Petitioners' testimony that they remained detained for weeks without the opportunity to speak with a lawyer.[109]

---

[98] Inj. Hrg., Doc. 86, 186:14–18.
[99] Id. at 112:17–24, 131:14–25 and 149:4–12.
[100] OIG Report, Doc. 87-12, 9.
[101] Inj. Hrg., Doc. 93, 24:1–4 and 25:1–8.
[102] Inj. Hrg., Doc. 86, 136:2–9.
[103] Id. at 122:20–123:10.
[104] Id. at 80:11, 91:4–12, 116:18–21 and 185:1–3.
[105] Id.
[106] Inj. Hrg., Doc. 93, 162:11–13 and 213:16–17.
[107] Inj. Hrg., Doc. 86, 103:14–25 and 204:16–21.
[108] Inj. Hrg., Doc. 93, 112:6–22.
[109] Inj. Hrg., Doc. 86, 95:1–10, 113:15–114:5, 125:9–17, 157:1–4, 183:16–184:2, 185:12–20, 196:1–12 and 212:25–213:5.  Petitioners also presented the testimony of Francisco Erwin Galicia, a United States citizen who CBP detained for about 23 days and ICE detained for three days.  (Id. at 51:6–11 and 63:5–6)  His attorney, Claudia Galan, also testified about her visit to the CBP Station in Falfurrias, where she was denied the ability to speak with Galicia.  (Id. at 29:22–31:16)  But Galicia is not a Petitioner and he was detained in a station not at issue in this lawsuit.  As a result, the Court finds this testimony of limited relevance, although it does show that during the 2019 Surge, individuals who should not have been detained by CBP could remain in custody for prolonged periods.

Along with the testimony about the general conditions at the CBP Stations, five Petitioners also spoke about their individual experiences. Their respective experiences highlight the specific manners in which the conditions harmed individuals. The witnesses also testified about the initial interviews that CBP provided them and the documents that CBP presented to them for signature. The testimony on this issue was mixed, but did raise concerns about irregularities in CBP's processes.

### 1. Kevin Ruano

CBP detained Ruano for about 26 days in the Brownsville and Fort Brown CBP stations.[110] While in custody, he experienced a fever and nosebleeds.[111] He requested medical attention, but when CBP told him he would lose his place in the removal queue if CBP transported him to a medical facility, he decided to forgo treatment.[112] Due to the limited meals provided, he lost ten pounds while detained.[113]

Ruano testified that CBP did not explain the asylum process and coerced him to sign certain documents. But he acknowledged that the Form I-831 that he signed contained accurate information.[114] Ruano also testified that the documents were in English, so he could not understand them. But the documents indicate that a translator was present for Ruano and he signed the document agreeing that CBP provided a translator.[115] Ruano testified that he asked to speak to his consulate but was never provided the opportunity to do so.[116]

### 2. Jonathan Rizo

CBP detained Rizo for about 26 days in the Brownsville and Fort Brown CBP stations.[117] He experienced a fever, body aches, and congestion while in CBP custody. At first, CBP only provided "a pill or something", but as his illness progressed, his fellow detainees pleaded with

---

[110] Qualia Decl., Doc. 87-24, 2.
[111] Inj. Hrg., Doc. 86, 102:6–103:6.
[112] *Id.* at 102:15–103:6.
[113] *Id.* at 104:21–22.
[114] *Id.* at 82:6–86:15, 95:10–12 and 107:20–108:25.
[115] *Id.* at 82:6–18 and 109:6–17; Form M-444, Doc. 92-1, 86.
[116] *Id.* at 84:2–24 and 95:10–12; Consular Not. Form, Doc. 92-1, 90 (explaining that the Consulate visits or otherwise contacts the detainee).
[117] Qualia Decl., Doc. 87-24, 2.

officers to provide additional medical attention.[118]  CBP took Rizo to the hospital, where he was diagnosed with water in his lungs. He received an injection and some pills to help with his ailments. [119]

Rizo also testified that CBP did not inform him of his right to apply for political asylum or his right to have his consulate notified.[120]  He explained that CBP agents "forced" him to sign "a lot of" documents, and that the individual who pressured him to sign spoke to him only in English and laughed when Rizo did not understand.[121]  At the same time, the Form I-867B contains the "Subject Refused to Sign" stamp, suggesting that Rizo exercised his right to not sign certain documents.  He also disagreed with the statement in the Form I-867B noting that Rizo told CBP that he entered the United States "to seek employment."  Rizo emphasized, "I'm sure that I didn't say that."[122]

### 3.  Bryan Lopez Lopez

CBP detained Lopez for about 52 days in the McAllen, Kingsville, and Corpus Christi stations.[123]  He recounted troubling experiences while in CBP custody, although his testimony left unclear whether these experiences occurred in a station at issue in this lawsuit.  He recalled agents directing racist and derogatory comments at him and his fellow detainees.[124]  He reported that when he slept on the floor, other detainees urinated on him several times.[125]  He also developed a foot infection while in CBP custody, and the unsanitary conditions aggravated the condition and prevented the medical treatment he received from being effective.[126]

Lopez confirmed that he initialed CBP's standard forms.[127]  But he also testified that during his initial interview, a CBP agent wanted him to sign a "deportation document", and that

---

[118] Inj. Hrg., Doc. 86, 121:8–25.
[119] Id. at 121:20–122:9.
[120] Id. at 124:6–9 and 130:17–20.
[121] Id. at 124:12–125:25 and 128:17–129:3.
[122] Id. at 128:3–12.
[123] Qualia Decl., Doc. 87-24, 4.
[124] Inj. Hrg., Doc. 86, 146:19–22 and 156:16–22.
[125] Id. at 155:8–14.
[126] Id. at 151:3–16.
[127] Id. at 147:24–149:5.

when Lopez refused and expressed a desire to apply for asylum, the agent dismissed him: "And he said, by the way, I'm not interested in that–everything is a lie."[128]  The agent also told him that an asylum officer could only help Lopez with his deportation.[129]

### 4.  Hector Rivera Rosa

CBP detained Rivera for about 50 days in the Harlingen, McAllen, and Fort Brown stations.[130]  He testified that while in custody, he experienced a toothache, fever, and an eye and foot infection, but received medical treatment solely for the toothache.[131]  The treatment proved ineffective, and when CBP denied him a follow up visit with a dentist, he pulled out his own tooth to stop the pain.[132]  In addition, the unsanitary conditions in the holding room aggravated his foot infection.[133]

Rosa testified that he requested to speak to his Consulate but never had a chance to do so while in CBP custody.[134]  CBP officers told Rosa that the Consulate could only help with his deportation.[135]  CBP officers also told him that an "an attorney cannot do anything for you."[136]

### 5.  Juan Carlos Asencio Asencio

CBP detained Asencio for about 32 days in McAllen.[137]  He testified that on top of developing a cough and fever, he also experienced a heart problem while in CBP custody.[138]  Around 2 A.M. one day, he woke up short of breath, started to gasp, and "ended up at that time for a few minutes without life."[139]  At the infirmary, a nurse diagnosed him with tachycardia and

---

[128] *Id.* at 147:20–148:11.
[129] *Id.* at 149:14–20 and 164:6–13.
[130] *Id.* at 181:19–24; Qualia Decl., Doc. 87-24, 4–5.
[131] Inj. Hrg., Doc. 86, 177:2–178:3, 180:13–17 and 188:22–189:4.  He clarified that he arrived at the CBP station with the foot infection.  *Id.* at 181:19–24.
[132] *Id.* at 178:5–16 and 181:1–18.
[133] *Id.* at 182:1–12.
[134] *Id.* at 184:2–8.
[135] *Id.* at 184:12–16.
[136] *Id.* at 185:1–11.
[137] Qualia Decl., Doc. 87-24, 5.
[138] Inj. Hrg., Doc. 86, 205:2 and 209:3–5.
[139] *Id.* at 208:21–209:11.

told him he had heart issues.[140]  He was given a laxative and taken back to his cell, despite his request to be taken to the hospital.[141]

Asencio's Form I-867B and Consular Notification Form contain a "Subject Refused to Sign" stamp.[142]  But Asencio testified that CBP officers never asked him to sign any documents and, as a result, he never refused to do so.[143]  He confirmed, however, that the Form I-867B contained accurate information.[144]  Asencio also testified that CBP refused his request to make a phone call and speak to an attorney.[145]  His Consular Notification Form shows that he declined having his Consulate notified, but Asencio refuted this statement: "At no time did I deny it, I asked to see one."[146]

### E. CBP's Mitigation Efforts during the 2019 Surge

During the 2019 Surge, CBP engaged in numerous efforts to relieve the overcrowding and improve conditions at its stations.  The record shows that CBP knew that it was not complying with its own standards—i.e., the TEDS Standards—but engaged in efforts to relieve the difficult situation that aliens were experiencing.

In general, CBP sought to transfer aliens to ICE custody as quickly as possible, prioritizing the processing of unaccompanied minors and family units.  At the height of the 2019 Surge, however, ICE also reached capacity and often refused to accept additional aliens, forcing CBP to maintain detainees in its custody.[147]  CBP began to transfer detained aliens to other CBP facilities, including to Laredo and San Diego.[148]  At one point, CBP transferred 7,500 people per

---

[140] *Id.* at 209:11–21.
[141] *Id.* at 210:12–25.
[142] Form I-867B, Doc. 91-1, 7; Consular Not. Form, Doc. 91-1, 11.
[143] Inj. Hrg, Doc. 86, 216:21–24.  As another anomaly, no translator signed Asencio's Form M-444, casting doubt on whether that document was translated for him.  Form M-444, Doc. 91-1, 9.
[144] Inj. Hrg. Doc. 86, 217:9–17.
[145] *Id.* at 212:13–213:5.
[146] Inj. Hrg., Doc. 86, 214:7–13; Consular Not. Form, Doc. 91-1, 11.
[147] OIG Report, Doc. 87-12, 3; Inj. Hrg., Doc. 93, 157:21–22.
[148] Inj. Hrg., Doc. 93, 20:17–21:2.

week to these other stations to alleviate the overcrowding in the Rio Grande Valley.[149]  CBP witnesses testified that they did not maintain custody of aliens to punish or deter them.[150]

To deal with the influx of aliens, CBP increased virtual processing, installed more processing terminals, and added 125 agents.[151]  In May 2019, CBP erected four tents, each capable of holding 142 people, at the McAllen station.[152]  About a month later, CBP in McAllen also began providing three hot meals a day to detainees, and installed mobile shower facilities that enabled detainees to receive a shower every 72 hours.[153]  At the same station, CBP also purchased drop sinks so detainees could wash themselves and their clothes more thoroughly.[154]  And at times, CBP officials spent their own money on body wash, shampoo and conditioner to help detainees.[155]

In May 2019, CBP opened a new station, called Donna I, with a holding capacity for 500 people.  A month later, Donna II opened, adding capacity for 500 aliens.  CBP uses Donna I and II for family units.[156]

## F. Third Quarter 2019: Improved Conditions and Decreased Time in Detention

In August 2019, CBP opened Donna III, a "soft-shell" facility capable of holding 2,000 single adults.[157]  The facility has sleeping mats, 160 portable restrooms, showers (60 for males and 60 for females), a telephone bank with 20 telephones, medical facilities and 68 washer/dryer units.[158]  The lights in Donna III remain on continuously for the safety of the detainees and CBP personnel.[159]

---

[149] *Id.* at 21:2–7.
[150] *Id.* at 21:23–22:1.
[151] *Id.* at 89:20–25.
[152] *Id.* at 166:21–167:12.
[153] *Id.* at 169:1–7, 170:8–20 and 171:2–11.
[154] *Id.* at 171:24–172:8.
[155] *Id.*
[156] *Id.* at 131:23–25.
[157] *Id.* at 30:8–14 and 104:22–25.
[158] *Id.* at 30:15–31:25, 36:16–20, 199:12–16, 202:16, 206:12–20, 208:4–5, 210:14–15 and 211:3–5.
[159] *Id.* at 213:19–20.

Also in August, CBP issued interim guidance for its agents about enhanced amenities for CBP detainees.[160]  Based on this guidance, when aliens currently arrive at Donna III, they receive clean clothes and a shower, and can access the phone bank.[161]  Each day, they receive a pre-pasted toothbrush, as well as three meals, two of which are hot.[162]  Every third day, detained aliens can make calls and shower.  They are provided with toothpaste, body wash and deodorant for each shower.[163]  CBP imposes no restrictions on who the detained aliens can call.[164]

At the time of the preliminary injunction hearing, CBP had 228 aliens detained in Donna III, or about 10% of the facility's capacity.[165]  The overall RGV sector operated at about 28% of capacity, with 1,700 people detained.[166]  The average time in CBP custody for single adult males from Mexico and other countries was about 35 hours and 37 hours, respectively, although these averages do not include non-deportable aliens.[167]  As one impact of the increased capacity, as of August 2019, CBP detained no aliens at the McAllen station.[168]

All three Donna facilities are only temporarily funded.[169]  Federal funding for Donna III currently exists through October of this year.[170]

CBP continues to apprehend about 500 aliens per day.[171]  CBP agreed that the possibility of another surge still exists.[172]

---

[160] RGV Sector Interim Guidance on Enhanced Amenities for Border Patrol Detainees, Doc. 94-1.
[161] Inj. Hrg., Doc. 93, 203:19–20 and 204:11–12.
[162] *Id.* at 211:3–5.
[163] *Id.* at 204:11–12 and 205:10–13.
[164] *Id.* at 209:14–20.
[165] *Id.* at 217:1–5 and 228:6–10.
[166] *Id.* at 40:20–22; RGV Sector Deportable Detainees in Custody, Doc. 99-1, 1.
[167] Inj. Hrg., Doc. 93, 101:21–23, 102:15–16 and 111:1–6; RGV Sector Deportable Detainees in Custody, Doc. 99-1, 2. CBP's official data differs from the testimony of Mark Navarro, a CBP supervisor who currently directs the Donna III facility.  He testified that detained aliens on average spend three to five days at Donna III.  (Inj. Hrg., Doc. 93, 224:2–5)  The Court accepts CBP's official data for average times in the CBP Stations as a whole.
[168] Inj. Hrg., Doc. 93, 174:22.
[169] *Id.* at 63:1–11.
[170] *Id.* at 104:22–25.
[171] *Id.* at 100:16–20.
[172] *Id.* at 41:8–11 and 56:22–57:11.

### G. Current Immigration Status of Petitioners[173]

Currently, no Petitioner remains in CBP custody. CBP designated Rivera-Rosa for removal proceedings and transferred him to ICE custody.[174] He remains detained.[175]

As to the other fifteen Petitioners, CBP designated them for expedited removal and ultimately transferred them to ICE custody. These Petitioners all expressed a fear of persecution or desire to apply for asylum, and have undergone a credible fear interview, although the Court is aware of the interview results for only five Petitioners.[176] Of those five, an asylum officer determined that Zuniga Gaitan, Landaverde Lopez and Recinos Nolasco had not established a credible fear of persecution or torture.[177] These individuals each appealed the decision to an Immigration Judge, who concurred with the asylum officer's findings. Upon the filing of a Joint Stipulation of Dismissal, the Court has dismissed without prejudice the claims of these three individuals.[178] The Court has similarly dismissed without prejudice the claims of Giron-Monterroza.[179] It is the Court's understanding that these aliens have been removed or deported.

An asylum officer concluded that Reyes-Vigil and Areas-Hernandez demonstrated a credible fear of persecution or torture, but ICE continues to keep these men in custody.[180] ICE also continues to detain Perez Valle, Flandez Fleites, Santay Son and Asencio Asencio.[181]

ICE has released Gonzalez Recinos, Herrera Rivera, Rizzo Ruano, Beltran Rizo and Lopez Lopez.[182]

---

[173] The spelling of some of the Petitioners' names differ slightly between the Second Amended Petition (Doc. 28) and the Declaration of Carmen Qualia (Doc. 87-24).
[174] Response, Doc. 48, 3.
[175] Second Am. Pet., Doc. 29, 13, ¶ 31.
[176] Inj. Hrg., Doc. 86, 260:17–261:6.
[177] Respondents' Notice, Doc. 105, 2–3; Respondents' Response to Plaintiffs' Proffer of Testimony, Doc. 104-1, 4–5. The Court GRANTS Respondents' Unopposed Motion for Leave to File Response to Plaintiffs' Proffer of Testimony (Doc. 104), and has considered as part of the preliminary injunction record the attachment to that motion.
[178] Order, Doc. 53; Order, Doc. 108.
[179] Order, Doc. 111.
[180] Inj. Hrg., Doc. 93, 265:15–17; Respondents' Response to Plaintiffs' Proffer of Testimony, Doc. 104-1, 4 (Reyes-Vigil).
[181] Second Am. Pet., Doc. 29, ¶¶ 12, 24–25, 28, 30 and 32.
[182] *Id.* at ¶¶ 20–23; Inj. Hrg., Doc. 86, 171:2–4.

## II. Analysis

Petitioners advance three causes of action in their Second Amended Petition. First, Petitioners Perez Valle, Landaverde Lopez, Lopez Lopez and Santay Son present a petition for writ of habeas corpus based on the allegations that Respondent Pitts continues to hold them in custody, that they have either not received their credible fear interviews or the results of that interview, and that they continue to "suffer[] the effects of their unlawful detention by CBP."[183] These four Petitioners seek their immediate release, either on personal recognition, bond or with electronic monitoring.

Second, Petitioners allege causes of action under the Administrative Procedure Act and the Fifth Amendment of the United States Constitution, basing these claims on allegations that CBP held detained aliens in custody for longer than 72 hours and in substandard conditions. As to these causes of action, Petitioners assert claims on their own behalf and on behalf of a putative class. As relief, Petitioners seek an order requiring that CBP transfer a detained alien to ICE custody within 72 hours of detention, or release the alien on bond, personal recognition or with electronic monitoring. Petitioners also ask the Court to order CBP to comply with enumerated standards regarding the conditions of detention at CBP Stations.[184]

In their Motion for Preliminary Injunction, Petitioners present all three causes of action as grounds for the requested injunctive relief. To obtain a preliminary injunction, a movant must establish: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury, if the injunction is denied, outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.[185]

---

[183] Second Am. Pet., Doc. 29, ¶¶ 21–22 (noting also that the four Petitioners who ICE had released from custody at the time of filing of the Second Amended Petition were no longer pursuing the habeas claim). As previously noted, the Court has dismissed the Petition without prejudice as to Giron Monterroza, Zuniga Gaitan and Landaverde Lopez, who at first requested this same relief.
[184] Motion, Doc. 41, 40.
[185] *City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018).

A. **Substantial Likelihood of Success on the Merits**

1. **Habeas Claim**

As indicated above, in their live pleading, Petitioners limit the scope of their habeas claim to certain Petitioners who remain in ICE custody, requesting that the Court order their immediate release. But in their Motion for Preliminary Injunction, all Petitioners argue they have demonstrated a likelihood of success as to their claim for habeas corpus based on the alleged violation of their due process rights under the Fifth Amendment when CBP held them for longer than 72 hours in substandard conditions.[186] Respondents object to this shift in the scope of the Petition, but also respond to the substantive arguments, as the issues are relevant to the other causes of action.

The Court agrees that Petitioners' petition for writ of habeas corpus is limited by the Second Amended Petition. In that pleading, Petitioners seek only immediate release for certain Petitioners, based mainly on allegations related to credible fear interviews while in ICE custody. Petitioners have not developed the record on the alleged delays in the credible fear interviews or obtaining the results of those interviews. And Petitioners do not brief the matter in their Motion for Preliminary Injunction. As a result, the Court finds that Petitioners have not established their right to relief under a writ of habeas corpus as presented in the Second Amended Petition.

At the same time, the analysis on the habeas claim that Petitioners seek to advance in their Motion for Preliminary Injunction applies to the causes of action with respect to other claims. Thus, the Court will consider those grounds in the context of a habeas claim.

An individual may seek habeas relief under 28 U.S.C. § 2241 if he is "in custody" under federal authority "in violation of the Constitution or laws or treaties of the United States."[187] The "sole function" of a habeas petition is to "grant relief from unlawful imprisonment or custody."[188] "Allegations that challenge the fact or duration of confinement are properly brought

---

[186] Motion, Doc. 41, 31–38.
[187] 28 U.S.C. § 2241(c).
[188] *Pierre v. United States*, 525 F.2d 933, 935–36 (5th Cir. 1976).

in habeas petitions, while allegations that challenge rules, customs, and procedures affecting conditions of confinement are properly brought in civil rights actions."[189] The Fifth Circuit follows a bright-line rule: "If a favorable determination . . . would not automatically entitle [the detainee] to accelerated release, . . . the proper vehicle is a [civil rights] suit."[190] Consistent with these principles, the Fifth Circuit has concluded that claims based on overcrowding in prisons and the denial of medical treatment for inmates cannot be challenged by a habeas corpus petition.[191] District courts have applied the principle to reject a habeas action based solely on alleged inadequate conditions.[192]

Here, Petitioners challenge both the duration and conditions of their confinement.

### a. Length of Detention

Petitioners argue that CBP's failure to transfer detainees to ICE custody "within a reasonable amount of time" creates "unconstitutionally prolonged detention",[193] and they request that the Court order CBP to effectuate this transfer within 72 hours or release the aliens on bond or with electronic monitoring.[194] But Petitioners cite no statutory language or caselaw that would support the imposition of a specific time limit for CBP's detention of aliens, and caselaw does not support grafting such a requirement into the law. On the contrary, the applicable statutes, as applied by the Supreme Court, suggest that no specific time limit applies to CBP's detention of aliens.

---

[189] *Schipke v. Van Buren*, 239 F. App'x 85, 85–86 (5th Cir. 2007) (citing *Spina v. Aaron*, 821 F.2d 1126, 1127–28 (5th Cir. 1987)); *see also Poree v. Collins*, 866 F.3d 235, 243 (5th Cir. 2017); *Cook v. Texas Dep't. of Criminal Justice Transitional Planning Dep't.*, 37 F.3d 166, 168 (5th Cir. 1994).
[190] *Carson v. Johnson*, 112 F.3d 818, 820–21 (5th Cir. 1997) (internal citations omitted).
[191] *Hernandez v. Garrison*, 916 F.2d 291, 293 (5th Cir. 1990).
[192] *See, e.g., Sarres Mendoza v. Barr*, No. CV H-18-3012, 2019 WL 1227494, at *2 (S.D. Tex. Mar. 15, 2019) (denying Honduran detainee's motion for leave to amend because the proposed claims on "conditions of confinement may not be brought in a habeas corpus proceeding, and are actionable, if at all, in a civil rights action"); *Morales-Corbala v. United States*, No. P-11-CV-00025-RAJ, 2011 WL 13185995, at *3 (W.D. Tex. July 19, 2011), *aff'd*, 498 F. App'x 467 (5th Cir. 2012) (explaining that a habeas petition was improper as the plaintiff was not challenging the "constitutionality of his detention and [did] not ask the Court to release him from [the defendant's] custody").
[193] Motion, Doc. 41, 37.
[194] *Id.* at 40.

The Supreme Court has recognized "detention during deportation proceedings as a constitutionally valid aspect of the deportation process."[195] "In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens."[196] At the same time, "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem" under the Fifth Amendment,[197] and this amendment "entitles aliens to due process of law in deportation proceedings".[198]

The law empowers CBP agents to detain aliens through warrantless arrests if they have reason to believe that the person is in the country in violation of immigration laws or regulations and "is likely to escape before a warrant can be obtained for his arrest."[199] For individuals suspected of violating immigration laws—i.e., a status offense—the CBP agent must take the alien "without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States."[200] CBP complies with this requirement by transporting detained aliens to one of its stations, where an immigration officer conducts an examination to determine admissibility.[201]

The applicable statutes typically require, and in all instances allow, for the detention of the detained aliens upon completion of the immigration officer's interview. Aliens found to be inadmissible and placed in expedited removal proceedings without the need for a credible fear interview generally are deported quickly and, as a result, prolonged detention does not occur. For aliens requiring a credible fear interview or who have expressed a desire to apply for asylum, an asylum officer conducts the requisite interview. If the asylum officer determines that an alien has shown a credible fear of persecution, "the alien *shall be detained* for further consideration of

---

[195] *Demore v. Kim*, 538 U.S. 510, 523 (2003).
[196] *Id.* at 521 (quoting *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976)).
[197] *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).
[198] *Reno v. Flores*, 507 U.S. 292, 306 (1993).
[199] 8 U.S.C. § 1357(a)(2); *see also* 8 C.F.R. §§ 287.8(c)(2)(i)–(ii).
[200] 8 U.S.C. § 1357(a)(2).
[201] Petitioners do not challenge the speed by which CBP presents aliens to an immigration officer for an examination.

the application for asylum."[202]  If the asylum officer reaches a contrary conclusion, the officer orders the removal of the alien, who "*shall be detained* . . . until removed."[203]  As for aliens subject to removal proceedings, such aliens "*shall be detained* for a proceeding under section 1229a of this title."[204]

The Supreme Court recently confirmed that "nothing in the statutory text [of Section 1225(b)] imposes any limit on the length of detention."[205]  This decision rejected the Circuit Court's holding that detained aliens possess a statutory right to periodic bond hearings under Section 1225(b).[206]  The Supreme Court noted that the statute mandates detention "until certain proceedings have concluded"—i.e., either for asylum or removal—and does not say "anything whatsoever about bond hearings."[207]

The Supreme Court in *Jennings* distinguished its 2001 decision in *Zadvydas*, in which the Court found an "implicit reasonable time limitation" in a statute governing the detention of a certain class of deportable aliens.  *Zadvydas* concerned an alien who had resided in the United States, but because of criminal conduct, had been ordered deported by an Immigration Judge.[208]  The immigration law at issue, 8 U.S.C. § 1231(a), required detention of an alien for whom a final removal order existed, and created a 90-day removal period.[209]  The same statute provided that after this 90-day period, the "[g]overnment may continue to detain an alien who still remains here or release that alien under supervision."[210]  The alien in *Zadvydas* had been detained for longer than 90 days because no country would accept him.[211]  The situation created the

---

[202] 8 U.S.C. § 1225(b)(1)(B)(ii) (emphasis added).
[203] 8 U.S.C. § 1225(b)(1)(B)(iv) (emphasis added).
[204] 8 U.S.C. § 1225(b)(2)(A)(emphasis added).  Under either Section 1225(b)(1) or (b)(2), detained aliens can be temporarily released on parole "for urgent humanitarian reasons or significant public benefit."  8 U.S.C. 1182(d)(5)(A).
[205] *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018).
[206] *Id.* at 836.
[207] *Id.* at 842.
[208] *Zadvydas*, 533 U.S. at 678.  *Zadvydas* represented a consolidation of two cases, each with one detained alien.  For the current matter, the Supreme Court's consideration of the case about the alien named Zadvydas presents the relevant analysis.
[209] *Id.* (citing 8 U.S.C. § 1231(a)(2)).
[210] *Id.* at 683 (citing 8 U.S.C. § 1231(a)(6)).
[211] *Id.* at 684

possibility of the Government holding him in detention indefinitely.[212]   The Supreme Court considered whether the post-removal statute authorized the Attorney General "to detain a removable alien *indefinitely* beyond the removal period or only for a period *reasonably necessary* to secure the alien's removal."[213]

The Supreme Court held that although the statute provided some discretion, it did not "suggest unlimited discretion" to hold detainees.[214] As a result, the Supreme Court construed Section 1231(a)(6) as containing "an implicit 'reasonable time' limitation, the application of which is subject to federal-court review," and found that six months was the presumptively reasonable detention period for post-removal detainees.[215]  The Supreme Court found that if this six-month period is surpassed and an "alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the government must respond with evidence sufficient to rebut that showing" or otherwise release him.[216]

Seventeen years later, the Supreme Court in *Jennings* distinguished *Zadvydas* as relying on "an ambiguity in Section 1231(a)(6)'s use of the word 'may.'"[217]   In contrast, the relevant portions of the statute in *Jennings* used "shall".[218] The Court held that "[w]hile *Zadvydas* found § 1231(a)(6) to be ambiguous, the same cannot be said of §§ 1225(b)(1) and (b)(2)."[219]   As a result, the Supreme Court declined to impose a reasonable time limitation for section 1225(b)(1) and (2) as it had for Section 1231(a)(6).

The Supreme Court also distinguished *Zadvydas* on similar grounds in *Demore*.[220] That case concerned whether 8 U.S.C. § 1226(c), which requires that the Attorney General take into custody an alien found removable for being convicted of certain enumerated crimes, violated the constitution by requiring detention with no requirement that the alien represent a flight risk or

---

[212] *Id.*
[213] *Id.* (emphasis in original).
[214] *Id.* at 696–97.
[215] *Id.* at 678, 701 (internal citations omitted).
[216] *Id.* at 701.
[217] *Jennings*, 138 S. Ct. at 844.
[218] *Id.*
[219] *Id.*
[220] *Demore*, 538 U.S. at 527–29.

pose a danger to society. The Supreme Court held that Congress, through Section 1226(c), could require that criminal aliens be "detained for the brief period necessary for their removal proceedings."[221] At the time, detention for criminal defendants under Section 1226(c) lasted "roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal."[222]

The aliens in *Demore* relied on *Zadvydas* to argue that unlimited detention without the opportunity to seek release on bond after a determined period violated the Constitution. The Supreme Court rejected this argument, distinguishing *Zadvydas* on two grounds. First, the Supreme Court noted that *Zadvydas* concerned aliens "for whom removal was 'no longer practically attainable,'"[223] and, as a result, the ongoing detention of the alien "did not serve its purported immigration purpose."[224] In contrast, wrote the Supreme Court, Section 1226(c) concerned the "detention of deportable criminal aliens pending their removal proceedings", which "serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings."[225] Second, the Supreme Court distinguished *Zadvydas* as involving a period of detention that was "indefinite" and "potentially permanent", while "the detention here is of a much shorter duration."[226]

*Jennings* and *Demore* provide the applicable analysis in the current matter. Petitioners base their challenge on the same statutes at issue in those cases. While the current lawsuit focuses on detained aliens in CBP custody, and *Jennings* and *Demore* concerned aliens presumably in ICE custody, the distinction does not affect the analysis. CBP detains aliens as part of the immigration process, under the authority of Sections 1225 and 1226. Those statutes do not impose time limits for CBP's transfer of detained aliens to ICE custody. Requiring CBP to release aliens on bond or with electronic monitoring after 72 hours of detention would graft into

---

[221] *Id.* at 513.
[222] *Id.* at 530.
[223] *Id.* at 527 (quoting *Zadvydas*, 533 U.S. at 690).
[224] *Demore*, 538 U.S. at 510.
[225] *Id.* at 527–28.
[226] *Id.* at 528.

the statute a requirement that Congress did not create. Following *Jennings* and *Demore*, the Court declines to do so.

The analysis in these Supreme Court decisions also supports the Court's conclusion. In *Demore* and *Jennings*, the Supreme Court highlighted that the detentions had an identifiable end point, such as the conclusion of the removal proceedings, while *Zadvydas* considered "potentially permanent" detention. In the current case, Petitioners do not allege that CBP has or intends to detain any alien indefinitely. And the factual record shows that CBP, even at the height of the 2019 Surge, consistently sought to transfer aliens to ICE custody expeditiously, with most aliens transferred within three weeks, which is significantly less time than the detention at issue in *Demore*. Petitioners appear to argue that the permissible length of detention should be limited here because CBP did not design its facilities for long-term detention of individuals. But the conditions in a facility do not determine whether the Constitution places time limitations on permissible detention. Deficient conditions may support legal actions based on the effect of those conditions, but they do not affect the constitutionally-permissible length of detention in those facilities. In *Demore*, *Jennings* and *Zadvydas*, the Supreme Court never considered the conditions of confinement as a factor.

As a result, Petitioners have failed to show a substantial likelihood of success on the merits as to a habeas corpus claim based on the length of their detention in CBP custody.

### b. Conditions of Detention

Petitioners also allege that the substandard conditions in which CBP maintained aliens during the 2019 Surge warrants habeas corpus relief. As the Findings of Fact in this Order indicate, Petitioners submitted substantial testimonial and documentary evidence showing appalling conditions that the detained aliens endured while in CBP custody during the 2019 Surge. Those conditions included, as examples, keeping aliens in standing-room-only holding cells for many days, deficient meals, the lack of basic hygienic products and access to showers, and limited medical care. The CBP witnesses who testified agreed that the conditions at the CBP

stations did not meet TEDS standards. In addition, specific individuals recounted very troubling experiences, including one alien pulling out his own tooth when he felt that the care that CBP provided was insufficient, and another alien experiencing a serious heart issue, only to be given a laxative and placed back in his holding room.

Petitioners devote much of their Motion and related briefs, as well as the testimony of their witnesses, on these substandard conditions and dismaying experiences. And no party contends that detained aliens should be kept in custody in such conditions for prolonged periods. But the question is whether detained aliens who endure such conditions of confinement have recourse through a petition for habeas corpus. Based on controlling authorities from the Supreme Court and the Fifth Circuit, they do not.

Habeas petitions can only "grant relief from unlawful imprisonment or custody"[227] and cannot be used to challenge "conditions of confinement."[228] For example, in *Carson*, an inmate brought a habeas petition challenging his administrative segregation within prison, arguing that segregating him violated the Double Jeopardy and Ex Post Facto Clauses of the Constitution.[229] The District Court had to determine whether the inmate could assert a claim based on habeas corpus, or whether the lawsuit represented a cause of action under 42 U.S.C. § 1983, as a civil action for an alleged deprivation of rights. The District Court held that the challenge concerned the conditions of confinement, which supported a § 1983 claim and not one in habeas. The Fifth Circuit affirmed, reasoning that "a favorable determination . . . would not automatically entitle [the prisoner] to accelerated release".[230] As a result, the inmate could not advance a habeas corpus claim. Other courts have reached similar conclusions when considering challenges to the conditions of confinement.[231]

---

[227] *Pierre*, 525 F.2d at 935–36.
[228] *Schipke*, 239 F. App'x at 85–86 (citing *Spina*, 821 F.2d at 1127–28); *see also Cook*, 37 F.3d at 168; *Poree*, 866 F.3d at 243.
[229] *Carson*, 112 F.3d at 819.
[230] *Id.* at 820–21 (quoting *Orellana v. Kyle*, 65 F.3d 29, 31 (5th Cir. 1995) (per curiam), *cert. denied*, 516 U.S. 1059 (1996)).
[231] *See, e.g., Hernandez*, 916 F.2d at 293 (explaining that seeking a transfer because of alleged overcrowded conditions, the denial of medical treatment and inadequate access to legal resources within a prison "is not a proper

In the current matter, Petitioners contend that the conditions of confinement that CBP maintains violates the detained aliens' constitutional rights.[232] They explain that "the abhorrent conditions at CBP facilities are the byproduct of the duration and fact of Petitioners' illegal confinement in facilities not designed for long-term detention."[233] But this characterization does not succeed. At the core of their allegations, Petitioners complain of the conditions in which CBP held them. Providing relief on this issue would not require the Petitioners' release, but would require only improving the conditions of confinement. Any person in custody can obtain relief from allegedly inadequate conditions by being released, but this fact does not create a permissible habeas corpus claim when the complaint turns on the conditions of confinement. As a result, Petitioners' allegations fall squarely within those cases concluding that the presented cause of action did not present a cognizable claim for habeas corpus relief.

Petitioners also argue that various cases support their proposed use of a petition for habeas corpus.[234] But those cases do not apply. In fact, most of those cases only reaffirm that a § 1983 claim is the proper method to challenge conditions of confinement.[235] Petitioners also rely on *Bell v. Wolfish*, 441 U.S. 520 (1979), in which prisoners challenged their conditions of confinement in habeas corpus. But the Supreme Court in *Bell* noted that the defendants did not challenge plaintiffs' "use of a writ of habeas corpus to challenge the conditions of their confinement, and petitioners [did] not raise that question in this Court."[236] Because another cause of action provided jurisdiction, the Supreme Court expressly did not address "the

---

subject for a habeas corpus petition"); *Sarres Mendoza*, 2019 WL 1227494, at *2 (denying a detained alien's motion to amend his petition for writ of habeas corpus when the proposed amendments concerned the conditions of confinement).

[232] Motion, Doc. 41, 32.

[233] Reply, Doc. 70, 3.

[234] Motion, Doc. 41, 32–36.

[235] *See Darnell v. Pineiro*, 849 F.3d 17, 20 (2d Cir. 2018) (explaining that the plaintiffs properly challenged the degrading conditions of their confinement, which included overcrowding, unusable toilets and extreme temperatures, through a § 1983 claim); *Jones v. Blanas*, 393 F.3d 918, 927–32 (9th Cir. 2004) (concluding that the plaintiff properly utilized § 1983 to challenge limited phone and visiting privileges and the lack of physical access to the law library); *Palmer v. Johnson*, 193 F.3d 346, 349–52 (5th Cir. 1999) (finding that the plaintiff properly challenged the conditions of his confinement, which included being forced to sit in a field all night without any way to keep warm, through a § 1983 claim). Petitioners also rely on *Hernandez v. Sessions*, 872 F.3d 976, 983 (9th Cir. 2017), in which the Ninth Circuit agreed that the District Court had jurisdiction over a habeas corpus claim, but the petitioner in that matter challenged bond determinations and not the conditions of his confinement.

[236] *Bell*, 441 U.S. at 527 n.6.

propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself."[237]  As a result, *Bell* does not support Petitioners' position here.

For these reasons, the Court finds that Petitioners have not shown a substantial likelihood of success on the merits of their petition for writ of habeas corpus based on the conditions of their confinement.

## 2.  Administrative Procedure Act (APA)

Petitioners allege that CBP violated the APA by holding detained aliens in CBP holding rooms for longer than 72 hours, and by maintaining substandard conditions in violation of CBP's own TEDS Standards.[238]  In their Motion, Petitioners focus their APA argument on CBP's alleged "failure to adhere to [its] 72-hour detention policy".[239]

Section 702 of the APA waives the Government's sovereign immunity when a plaintiff can satisfy two requirements.  First, the plaintiff "must identify some 'agency action' affecting him in a specific way, which is the basis of his entitlement to judicial review."[240]  Second, for purposes relevant to this lawsuit, a plaintiff must establish that he "suffered legal wrong because of the challenged agency action."[241]  A plaintiff advancing such a claim seeks review "pursuant only to the general provisions of the APA."[242]  In such an action, "[t]here must be 'final agency action' for a court to conclude that there was a waiver of sovereign immunity".[243]  "If there is no final agency action, a federal court lacks subject matter jurisdiction."[244]

---

[237] *Id.*

[238] Second Am. Pet., Doc. 29, ¶¶ 66-69.

[239] Motion, Doc. 41, 26.  Petitioners in their Motion also contend that CBP's "failure to abide by federal regulations mandating that detainees be given a credible fear interview and be provided with an opportunity to consult with an attorney prior to a CFI interview" supports an action under the APA.  (Motion, Doc. 41, 26) But Petitioners do not include such an allegation in their live pleading.  As a result, the Court will not consider this ground for relief.

[240] *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 489 (5th Cir. 2014) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990)).

[241] *Lujan*, 497 U.S. at 883.

[242] *Alabama-Coushatta Tribe of Texas*, 757 F.3d at 489.

[243] *Alabama-Coushatta Tribe of Texas*, 757 F.3d at 489 (citing *Lujan*, 497 U.S. at 882); *see also Am. Airlines v. Herman*, 176 F.3d 283, 287 (5th Cir. 1999) (explaining that absent final agency action, a court lacks subject matter jurisdiction).  A plaintiff can also allege an APA claim by showing that she was "adversely affected or aggrieved by that action within the meaning of a relevant statute."  5 U.S.C. § 702.  Such an action does not include a finality requirement.  *Alabama-Coushatta Tribe of Texas*, 757 F.3d at 489.  In the current matter, Petitioners do not allege

The APA defines "agency action" as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."[245] While "[a]gency action . . . need not be in writing to be final and judicially reviewable",[246] the "only agency action that can be compelled under the APA is action legally *required*."[247] "As a general rule, where the rights of individuals are affected, an agency must follow its own procedure, even where the internal procedures are more rigorous than otherwise would be required."[248] In contrast, "statements of policy" are "not intended to have the force of law . . . [and] do not create legal rights or obligations between an agency and members of the public."[249] The APA also does not provide a waiver of sovereign immunity for "programmatic challenges."[250]

For agency action to be "final", it must (1) "mark the 'consummation' of the agency's decision making process, it must not be of a merely tentative or interlocutory nature," and (2) "be one by which rights or obligations have been determined, or from which 'legal consequences will flow.'"[251] For example, the "termination of asylum does not mark the consummation of a decision making process" because "it represents only an intermediate step in a multi-stage administrative process".[252]

In the current matter, Petitioners contend that CBP's "deviation" from the TEDS Standards governing the length of an alien's detention represents final agency action subject to

---

such a cause of action. *See* Reply, Doc. 70, 3 ("This lawsuit involves a challenge to a 'final agency action' for purposes of the APA.").

[244] *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) (quoting *Peoples Nat'l Bank v. Office of the Comptroller of the Currency of the U.S.,* 362 F.3d 333, 336 (5th Cir. 2004)).

[245] 5 U.S.C. § 551(13).

[246] *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) *(citing Venetian Casino Resort LLC v. EEOC,* 530 F.3d 925, 929 (D.C. Cir. 2008)).

[247] *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004) (emphasis in original).

[248] *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981) (citing, *inter alia, Morton v. Ruiz*, 415 U.S. 199, 232 (1971)).

[249] *See Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, . . . lack the force of law . . ."); s*ee also Prof'ls & Patients for Customized Care v. Shalala*, 847 F. Supp. 1359, 1364 (S.D. Tex. 1994), *aff'd*, 56 F.3d 592 (5th Cir. 1995).

[250] *See Alabama-Coushatta Tribe of Texas*, 757 F.3d at 490 ("The Supreme Court's decision in *Lujan* 'announced a prohibition on programmatic challenges'—challenges that seek 'wholesale improvement' of an agency's programs by court decree, rather than through Congress or the agency itself where such changes are normally made.").

[251] *Bennett v. Spear*, 520 U.S. 154, 178–79 (1997) (internal citations omitted).

[252] *Qureshi*, 663 F.3d at 781–82.

judicial review under the APA.[253]  Petitioners note that the Supreme Court has held that agencies must follow their internal agency policies, and whether they do so is subject to judicial scrutiny.[254]  As the TEDS Standards refer to detention for up to 72 hours, and the evidence shows that CBP kept aliens detained for well beyond that period, Petitioners argue that CBP violated its internal agency policy.

Petitioners' reliance on the time limitation within the TEDS Standards does not support a claim under the APA.  The provision in the TEDS Standards does not have the force of law or create legal rights or obligations between CBP and the public and, as a result, represents a policy statement.  No legal consequences flow from CBP's detention of aliens and no rights are affected by whether a detained alien remains in CBP custody for two days or twenty days.  Petitioners allege that CBP holds detained aliens in unbearable conditions, does not allow counsel to visit aliens at CBP stations, and does not provide credible fear interviews.  But those alleged deficiencies are unrelated to the time that the detained aliens remain in CBP's custody.

In addition, Section 4.1 of the TEDS Standards presents no legally required standard.  On the contrary, the provision expressly provides discretion to CBP:

> Detainees should *generally* not be held for longer than 72 hours in CBP hold rooms or holding facilities.  Every effort must be made to hold detainees for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and *as operationally feasible.*[255]

The language creates no legal requirement that limits detention to 72 hours, but contemplates that the 72-hour goal may not always be met.  Petitioners' position, effectively, is not that the Court should require CBP to comply with Section 4.1 of the TEDS Standards, but that the Court should impose a modified version of that provision.  The APA does not authorize such relief.

Petitioners argue that finding the TEDS Standards not subject to an APA challenge "is inconsistent with a well-developed and growing body of case law in which arbitrary deviations

---

[253] Motion, Doc. 41, 27.
[254] *Id.* (citing *Morton v. Ruiz*, 415 U.S. 199 (1974)).
[255] TEDS Standards, Doc. 87-21, § 4.1 (emphasis added).

from policies may be challenged through the APA."[256]  But the authority that Petitioners rely on for this argument concerned agency policies that imposed express requirements on agency officials, with no indication that those policies were discretionary.[257]  The provision in the TEDS Standards on which Petitioners rely does not resemble the binding directives at issue in those cases.  Rather, Section 4.1 merely creates a goal for the length of detention that CBP should strive to meet for detained aliens.

Moreover, as summarized in Section I.D of this Order, the evidentiary record contains ample evidence that CBP engaged in significant efforts to limit the time that detainees spent in CBP custody, and that reducing the time in custody during the 2019 Surge was not operationally feasible.  To the extent that Petitioners contend that the Court can enforce a policy statement when an agency arbitrarily deviates from a standard, the record does not demonstrate such deviation.  Rather, the detention of aliens beyond 72 hours stemmed from the volume of individuals during the 2019 Surge, as well as CBP's intentional decision to prioritize processing family units and unaccompanied minors, which increased the length of detention for aliens in other categories.  Based on the preliminary injunction record, Petitioners have not established that CBP arbitrarily deviated from the TEDS Standards.

The amicus brief filed in support of Petitioners' position on this issue is also not persuasive.  Along with re-urging Petitioners' arguments, Amici presents the new argument that "CBP is only statutorily authorized [under 6 U.S.C. §§ 211(c)(8)(B) and 211(m)(3)] to operate short-term detention facilities that hold individuals for 72 hours or less," and that CBP violated this statute when they detained aliens for longer than 72 hours.[258]  Amici, however, mis-applies this statute.  Generally, Section 211 creates the U.S. Customs and Border Protection department.

---

[256] Reply, Doc. 72, 5.

[257] *See, e.g., Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138–139 (D.D.C. 2018) (concerning an unwritten policy that ordered local officials to heavily weight deterrence when deciding whether to grant a detained alien parole); *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 174 (D.D.C. 2015) (concerning an alleged DHS policy that directed ICE officers to consider deterrence of mass migration as a factor when making custody determinations); *Ravulapalli v. Napolitano*, 773 F. Supp. 2d 41, 53 (D.D.C. 2011) ("Plaintiffs have alleged that USCIS issued binding policy guidelines that required the agency to determine the validity of an unapproved I–140 petition that is withdrawn after an I–485 application has been pending for 180 days.").

[258] Amicus, Doc. 35, 12 and 15 (internal quotation marks omitted).

Sections 211(c)(8)(A) and (B) identify areas in which CBP, ICE, and the United States Citizenship and Immigration Services are to coordinate together to "enforce and administer all immigration laws."[259]  One of those areas is "short-term duration" of aliens, and Amici argues that the inclusion of this term means that CBP cannot hold aliens for longer than 72 hours.  But the specified areas of collaboration in Section 211(c)(8) do not represent an exhaustive list.  The statute introduces the list with the term "including," which under standard canons of construction, "is not one of all-embracing definition".[260]  ICE and CBP coordinate generally to enforce the country's immigration laws, including the detention of aliens for short or longer periods.

Amici emphasizes the definition of "short-term detention" in Section 211(m)(3): "[T]he term short-term detention means detention in a U.S. Customs and Border Protection processing center for 72 hours or less, before repatriation to a country of nationality or last habitual residence."[261]  Amici argues the definition should limit CBP's detention of aliens under Section 211(c).  But Section 211(m)(3) by its own terms applies to "this subsection"—i.e., § 211(m)—and, as a result, not to Section 211(c).  Congress understood the distinction between sections and sub-sections.  For example, Section 211(b)(1) also defines a term—"Commissioner"—and applies the definition to "this section"—i.e., the entirety of Section 211.[262]  The Court must apply the plain meaning of the statute's text, which requires the conclusion that the definition for "short-term duration" in § 211(m) does not define that term in § 211(c).

### 3.  Due Process Clause of the Fifth Amendment

Petitioners allege that their inability to "apply for asylum and challenge the conditions of their detention violated their right to access counsel and the courts while in [CBP] custody."[263]  They argue that without the ability to meet with counsel in CBP Stations, they cannot properly

---

[259] 6 U.S.C. § 211(c)(8).
[260] *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941).
[261] 6 U.S.C. § 211(m)(3) (emphasis added).
[262] 6 U.S.C. § 211(b)(1).
[263] Motion, Doc. 41, 18.

prepare for legal proceedings, and this obstacle violates their right to access to counsel under the Fifth Amendment.[264]  They also contend that CBP's treatment of aliens at CBP Stations coerced detained aliens to forgo their asylum rights or credible fear interviews, denying them their right to access the courts.[265]

### a.  Right to Access Counsel

When a detained alien expresses a fear of persecution in her home country or a desire to apply for asylum, the alien must be notified of the "right to consult with other persons prior to the interview [with an asylum officer] . . . at no expense to the United States Government."[266]  In addition, in removal proceedings, aliens have a statutory right to retain counsel at their own expense.[267]  The Constitution protects this right, although it arises under the Due Process Clause of the Fifth Amendment and not under the Sixth Amendment right to counsel in criminal proceedings.[268]

But no Constitutional or statutory right to counsel, whether appointed or retained by the individual, arises before a detained alien conveys a desire to apply for asylum or expresses a fear of persecution.  In fact, if the detained alien expresses no fear of persecution or desire to apply for asylum, the governing statute empowers CBP to deport Mexican aliens through an expedited removal process, with no hearings or other procedural requirements, such as access to counsel.[269]  To grant the requested relief, the Court would have to graft into the statute a right for aliens to access counsel at a point previously unrecognized in the law.  The Court declines to do so.

The parties agree that once a detained alien requires a credible fear interview, the alien must be notified of the right to contact an individual, including counsel.[270]  As long as the

---

[264] *Id.* at 18–25.
[265] *Id.*
[266] 8 C.F.R. § 235.3(b)(4)(i)(B); *see also* 8 U.S.C. § 1225(b)(1)(B)(iv) ("An alien who is eligible for [an asylum] interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof.").
[267] 8 U.S.C. § 1362.
[268] *Barthold v. INS*, 517 F.2d 689, 690 (5th Cir. 1975).
[269] *See* 8 U.S.C. § 1225(b)(1)(A)(i)–(iii); *see also Brumme v. I.N.S.*, 275 F.3d 443, 447 (5th Cir. 2001).
[270] Motion, Doc. 41, 6; Response, Doc. 48, 7.

notification occurs before the interview, the Government has complied with the statutory provision. Here, Petitioners do not allege that they underwent credible fear interviews without having had access to counsel. Even if they had made such an allegation, the factual record would lend no support. The credible fear interviews occur once the detained alien enters ICE custody; CBP does not provide such interviews. As a result, the fact that CBP does not allow access to counsel for detained aliens does not show that those aliens underwent a credible fear interview without the opportunity to communicate with counsel or the person of their choice. No evidence in the preliminary injunction record demonstrates that a detained alien underwent a credible fear interview after having been denied the opportunity to communicate with the person of their choice, including counsel.

Petitioners also rely heavily on *Nunez v. Boldin*, 537 F. Supp. 578, 582 (S.D. Tex.), *appeal dismissed,* 692 F.2d 755 (5th Cir. 1982), a case that represents only persuasive authority, for their argument that the Fifth Amendment requires CBP to allow attorneys to visit with detained aliens while in CBP custody. That decision, however, did not concern detained aliens who had not yet conveyed a desire to apply for asylum or a fear of persecution. Rather, that case concerned aliens who possessed a recognized right to access to counsel, and the District Court issued a preliminary injunction to render that right meaningful. As indicated, Petitioners here had no statutory or constitutional right to access to counsel while in CBP custody.

For these reasons, the Petitioners have not established a likelihood of success on the merits as to their Fifth Amendment claim that they should be provided access to counsel when in CBP custody.

### b. Access to Courts

Petitioners also allege that the conduct of CBP officials led detained aliens to waive their rights to apply for asylum or to express a fear of persecution, and that the conditions at the CBP

Stations thwarted their ability to access such rights.[271]  The Court considers this argument as presenting an argument analogous to an access-to-court claim.

To have standing to assert an access-to-court claim, an individual must show "actual injury."[272]  Specifically, a "plaintiff must show that he lost an actionable claim or was prevented from presenting such a claim because of the alleged denial."[273]  A plaintiff must show "that his position as a litigant was prejudiced" as a direct result of the denial of access.[274]  In the context of a proposed class action, the "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."[275]

Moreover, the right of access to courts is satisfied by "*adequate* assistance from persons trained in the law."[276] Access to courts "guarantees no particular methodology but rather the conferral of a capability—the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts."[277]

In this matter, Petitioners fail to satisfy the "actual injury" requirement.  Petitioners claim that there *may* be individuals in CBP custody that want to file a habeas corpus claim, but are unaware of the opportunity to do so.[278]  This allegation is speculative, however, and does not meet the *Lewis* standard of "actual injury."  Unidentified members of the purported class cannot satisfy this standard.[279]

The record here also shows that Petitioners were provided with the ability to assert their legal rights.  The Petitioners designated for expedited removal all expressed a fear of persecution or desire to apply for asylum, and received their credible fear interview.  Some obtained a

---

[271] Motion, Doc. 41, 18–25.
[272] *Lewis v. Casey*, 518 U.S. 343, 346 (1996).
[273] *Ramirez v. Delcore*, No. CV C-07-48, 2007 WL 2142293, at *5 (S.D. Tex. July 25, 2007) (citing *Lewis*, 518 U.S. at 356).
[274] *Eason v. Thaler*, 73 F.3d 1322, 1328 (5th Cir. 1996).
[275] *Lewis*, 518 U.S. at 357 (internal quotation marks omitted).
[276] *Lewis*, 518 U.S. at 356 (quoting *Bounds v. Smith*, 430 U.S. 817, 828 (1977) (emphasis in original)).
[277] *Lewis*, 518 U.S. at 356.
[278] Motion, Doc. 41, 22.
[279] *Lewis*, 518 U.S. at 357.

favorable finding of credible fear.  The preliminary injunction record demonstrates that Petitioners had their day in court—here, a credible fear interview with the opportunity to appeal any adverse findings to an Immigration Judge.  As a result, Petitioners are unlikely to be successful on the merits of this cause of action.

Having concluded that Petitioners have not shown a likelihood of success on the merits on any of their causes of action, their Motion fails.  The Court will  proceed to consider the remaining elements for the issuance of a preliminary injunction to demonstrate that even if Petitioners presented a claim with a likelihood of success, they would not have satisfied the applicable standard for the requested relief.

### B.  Irreparable Injury

 "The purpose of an injunction is to prevent future violations."[280]  A movant "must show a real and immediate threat of future or continuing injury apart from any past injury."[281]  The harm must be of a nature "for which there is no adequate remedy at law."[282]  While the deprivation of a fundamental right constitutes irreparable harm requiring issuing a preliminary injunction,[283] the harm cannot be speculative.[284]

As Petitioners have not established a violation of their constitutional or statutory rights, they fail to demonstrate an irreparable injury.  In addition, as to their claims premised on the conditions at CBP Stations during the 2019 Surge, the preliminary injunction record demonstrates the discontinuance of the allegedly illegal conduct.  In general, "the cessation of a violation by the defendant will require plaintiff to show that injunctive relief is still necessary."[285]  For example, in *Morales*, the Texas Youth Council (TYC) allegedly violated the Eighth Amendment rights of individuals in detention facilities. The District Court granted a

---

[280] *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) (citing *Swift & Co. v. United States*, 276 U.S. 311, 326 (1928)).
[281] *Aransas Project v. Shaw*, 775 F.3d 641, 648 (5th Cir. 2014).
[282] *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013).
[283] *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976).
[284] *See Hurley v. Gunnels*, 41 F.3d 662 (5th Cir. 1994) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)); *see also Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).
[285] *Morales v. Turman*, 562 F.2d 993, 996 (5th Cir. 1977).

preliminary injunction, detailing some policies that led to the violations. When appealed, however, the TYC policy had changed in a manner that could have impacted the District Court's ruling. As a result, the Fifth Court remanded the case for further proceedings to see whether the policy changes "would eliminate the risk of further constitutional violations."[286]

In the current matter, conditions for detained aliens in CBP Stations have improved markedly since the filing of this lawsuit. The improvements stem from both a decrease in the number of detained aliens and the increased capacity that the Donna III facility provides. Overcrowding no longer exists, as CBP currently stands at less than 30% capacity.[287] The average time in CBP custody stands below 72 hours.[288] And detained aliens at Donna III and some other stations receive two to three hot meals a day, as well as regular showers, sleeping mats, sufficient hygiene supplies and laundry services. In short, the substandard conditions that detained aliens endured during the 2019 Surge no longer exist.

Petitioners argue that federal funding for the Donna facilities is not permanent, and currently exists only through October of this year.[289] They also note that to the extent that CBP attributes the decreased number of detained aliens in custody to the efforts of the Mexican Government, the Migrant Protection Protocol, and agreements with Central American countries, those supporting factors could disappear without warning.[290] But while Petitioners' argument is logically true, it is Petitioners who bear the burden of showing the need for an injunction to prevent future harm. The supporting factors that helped improve the substandard conditions currently are in place, and no evidence shows that they will be removed in the foreseeable future. Petitioners cannot carry their burden simply by arguing that the status quo is not guaranteed.

---

[286] *Morales*, 562 F.2d at 996.
[287] Inj. Hrg., Doc. 93, 40:20−22; RGV Sector Deportable Detainees in Custody, Doc. 99-1, 1.
[288] Inj. Hrg., Doc. 93, 101:21−23 and 102:15−16; RGV Sector Deportable Detainees in Custody, Doc. 99-1, 2. These averages, however, do not include non-deportable detainees. (Inj. Hrg., Doc. 93, 111:1−6)
[289] *Id.* at 104:22−25.
[290] Inj. Hrg., Doc. 93, 71:10−19; Conjoint Communication from SRE-SEGOB, Doc. 87-26, 2.

The Court finds that Petitioners have not demonstrated an irreparable injury that supports the granting of the requested preliminary injunction.

### C. Public Interest and Balance of Equities

When considering whether to issue a preliminary injunction, a court must "balance the competing claims of injury and consider the effect on each party of the granting or withholding of the requested relief."[291]  To issue a preliminary injunction, the court must conclude that the movant would "suffer more harm without the injunction than the enjoined party if relief is granted."[292]  The movant also must show that the requested preliminary injunction will not be adverse to public interest.[293]  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights."[294]  While the protection of constitutional rights are "[o]rdinarily . . . the highest public interest at issue in a case," matters such as national security and national defense can outweigh a movant's constitutional rights.[295]

Petitioners request that the Court order CBP to release detained aliens on bond or with electronic monitoring after 72 hours of detention, if they cannot be transferred to ICE custody by that time.  Such an order would raise genuine security concerns for the public in those communities, and could alter CBP's prioritization of processing detained aliens.  Given that CBP has a mandate to not release aliens who pose a security risk to the public, CBP would have to prioritize identifying those individuals to ensure their transfer before the proposed 72-hour deadline.  This requirement necessarily would affect CBP's current focus on unaccompanied children and family units, who represent more vulnerable population.[296]  Additionally, "72 hours

---

[291] *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 543 (1987); *see Winter v. Natural Res. Def. Counsel, Inc.*, 555 U.S. 7, 27 (2008).

[292] *Texas v. United States*, 86 F. Supp. 3d 591, 674–75 (S.D. Tex.), *aff'd,* 809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015).

[293] *Star Satellite, Inc. v. Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986).

[294] *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (internal quotation marks omitted); *see also John Doe I v. Meese*, 690 F. Supp. 1572, 1575 (S.D. Tex. 1988) (concluding that the "granting of a preliminary injunction will disserve the public interest and would subvert Congressional intent underlying the Immigration Reform and Control Act of 1986" where the putative class requested a court order mandating that the INS assume all facts to be true in an applicant's asylum application).

[295] *See Def. Distributed v. United States Dep't of State*, 838 F.3d 451, 458 (5th Cir. 2016)

[296] Inj. Hrg., Doc. 93, 16:13–24.

is not always enough time for USBP to confirm aliens' criminal histories."[297] As a result, CBP could face having to release individuals without fully understanding their criminal history.

Petitioners do contend that detaining aliens in CBP facilities for prolonged periods increases the financial burden on taxpayers and CBP's ability to operate. This argument has some force, but not enough to overcome the weight of the possible harm to the public interest. In fact, a mandated deadline for releasing detained aliens would also run counter to statutory defaults that aliens be detained pending a credible fear interview, and if found not to have such a fear, until removed.[298]

In addition, Petitioners also request a preliminary injunction that would impose detailed requirements on how CBP detains aliens.[299] The proposed standards include the number of calories and grams of protein provided in meals, as well as the length in minutes of permitted phone calls. Petitioners offer no caselaw supporting their request that the Court effectively micro-manage the detainment of aliens in CBP Stations. At the preliminary injunction hearing, Petitioners' counsel referenced the *Flores* Settlement Agreement as containing similarly detailed requirements in an injunction. But those standards represent a settlement among the parties, in a case about the treatment afforded minors. In contrast, in a case involving the detention of adults in a prison setting, the Supreme Court expressed strong reservations about judicial relief that imposes detailed requirements on the operations of a facility in which individuals are detained.[300] Granting the requested relief here would impose a substantial burden on CBP to meet the proposed court-ordered requirements.

---

[297] Motion, Doc. 48, 40; *see* Inj. Hrg., Doc. 93, 92:5–11.
[298] 8 U.S.C. § 1225(b)(I)(B)(iii)(IV).
[299] Second Am. Pet., Doc. 29, ¶ 70.
[300] *See Bell*, 441 U.S. at 562.

### III.     Conclusion

For these reasons, it is:

**ORDERED** that Petitioners' Motion for Preliminary Injunction is **DENIED**.

SIGNED this 15th day of October, 2019.

_____
Fernando Rodriguez, Jr.
United States District Judge